Filed 12/20/21; Certified for Publication 1/12/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| OLD EAST DAVIS NEIGHBORHOOD ASSOCIATION,<br><br>   Plaintiff and Appellant,<br><br> v.<br><br>CITY OF DAVIS et al.,<br><br>   Defendants and Appellants;<br><br>TRACKSIDE CENTER, LLC,<br><br>   Real Party in Interest and Appellant. | C090117<br><br>(Super. Ct. No. CVPT172111) |

   Trackside is a proposed mixed-use building project in the City of Davis, sandwiched between the Downtown Core and Old East Davis, an older neighborhood. After the city council approved Trackside, plaintiff Old East Davis Neighborhood

1

Association ("the Association") petitioned for a writ of mandate, and the trial court found insufficient evidence supported the City's finding that Trackside was consistent with applicable planning documents. The court specifically cited the lack of evidence that Trackside served as a "transition" from the Downtown Core to Old East Davis.

On appeal, defendants City of Davis and City Council, along with real party in interest Trackside Center, LLC ("the City" and "Trackside") challenge that ruling, contending the trial court applied the wrong legal standard in evaluating consistency with planning documents, and that substantial evidence supports the City's finding that Trackside was consistent with applicable planning requirements and guidelines.

The League of California Cities, the California State Association of Counties, and Sacramento Area Council of Governments have also filed an amicus curiae brief in support of the City and Trackside.

The Association responds that the trial court's determination was correct. It also raises three additional contentions by way of cross-appeal: (1) the trial court failed to rule on its claims pertaining to CEQA compliance; (2) Trackside violates City design guidelines under the Davis Municipal Code; and (3) the Trackside project failed to meet the requirements for a Sustainable Communities Environmental Assessment.

We conclude substantial evidence supports the City's approval, and the Association's contentions on cross-appeal lack merit. We will therefore reverse the judgment granting the petition for writ of mandate.

FACTS AND HISTORY OF THE PROCEEDINGS

The Trackside Project

The Trackside project is a proposed four-story, 47,983 square-foot mixed use building, offering 8,950 feet of ground floor retail space and 27 apartment units on three upper floors. The proposed Trackside site is a half-acre of land, zoned mixed-use, that

sits in a "transition area" between the Downtown Core and the Old East Davis residential neighborhood.

To the site's immediate west, train tracks run north and south, marking the eastern border of the "Downtown Core." To the site's immediate east, a 30-foot-wide alley runs north and south, marking the western border of the Old East Davis neighborhood. Abutting the alley, on the Old East Davis side are several single-family homes.

We note that, while the Association insists Trackside is located within the Old East Davis neighborhood, the applicable planning documents do not support this. The Davis Downtown and Traditional Residential Neighborhoods Design Guidelines (discussed below), defines the western boundary of the Old East neighborhood as "Generally the alley parallel to I Street, one-half block east of the railroad tracks." The Trackside site is west of the alley.

To the north of the Trackside site, there is a landscape and rock business, which is also in the transition area. To the south, 3rd Street runs east and west, with several small commercial and retail businesses on the opposite side of the street. Currently, two single-story commercial buildings sit at the Trackside site.

Both the Downtown Core and the Trackside site are in what is known as "the Core Area Specific Plan study area." The Trackside site, along with the Downtown Core, and Old East Davis, is also in an area known as the "Downtown and Traditional Neighborhood Overlay District." The planning documents covering these areas, along with the Davis General Plan, are central to this dispute.

The Core Area Specific Plan study area is covered by the City of Davis's Core Area Specific Plan (CASP), a planning document "provid[ing] a comprehensive set of policies, guidelines and implementation strategies for promoting, guiding and regulating growth in the Core Area," in order to "allow the area to continue to function as the City's social, cultural, retail center, and professional and administrative office district in a manner that enhances pedestrian activity." To that end, the CASP "establishes the

3

strategies which are required for the systematic execution of the City's General Plan for the area covered by the Core Area Specific Plan."

The Downtown and Traditional Neighborhood Overlay District, in turn, is covered by the Davis Downtown and Traditional Residential Neighborhoods Design Guidelines (DTRN), which offers guidelines, "respond[ing] to community concerns about the manner in which new investment in the center of Davis can enhance, rather than erode, its valued character."

The Staff Report

A staff report, prepared for the city council, recommended approving Trackside. The report found Trackside consistent with General Plan policies, including its requirement for "an architectural 'fit' with Davis' existing scale . . . ." Also satisfied were CASP policies encouraging more intense mixed-use development and accommodating new buildings with floor areas up to three times the site area, while still maintaining scale transition and small-city character.

And as to the DTRN guidelines, the report noted the Trackside site is in two mixed-use special character areas (the "Core Transition East" and "Third Street") each having the objective of encouraging new mixed use buildings while "improving the visual and land use transition," as well as "respecting the neighborhood's residential character . . . ." The site has also been identified as an "opportunity site[]," selected as one of 30 under-utilized downtown sites for redevelopment in order to increase downtown residents and reduce the need for development of rural agricultural land. To reduce Trackside's density, the report noted, would actually be inconsistent with DTRN Opportunity Sites guidelines. The DTRN explains: "Approximately 20 acres of opportunity sites exist in the downtown that could accommodate uses that would support traditional Davis at large and the downtown specifically. Developed as mixed-use projects at an average density of 40 units per acre, this represents 800 additional units and

4

1,600 more downtown residents. These residents would give downtown a 24-hour life and social dimension that office and commercial uses cannot provide."

The staff report also noted that DTRN guidelines allow for "[i]ncreased building scale and height . . . in portions of mixed use special character areas such as along B and 3rd Streets where new development patterns are allowed."

The staff report explained that "the properties along the east side of the tracks have historically hosted commercial and industrial businesses which tie the area to the downtown commercial area." And nearby homes are separated from the commercial properties by a 30-foot alley, which is twice the typical 15-feet (or fewer) found in downtown and adjacent residential areas.

Citing public concerns with Trackside's mass and scale, the report also explained that "[g]iven that the proposed project is in a Transition Area and a Special Character Area where greater density and intensity is envisioned, staff feels 4 stories (approximately 10' higher than some existing homes not located in areas where greater intensity is envisioned) is approvable as designed and that the mass, scale and height of revised project will be compatible with the area."

And citing DTRN guidelines that "a building shall appear to be in scale with traditional single-family houses along the street front," the report called the "in scale" requirement subjective and went on to explain: "the project has been designed in order to ensure that it provides a transition from the Downtown to the Old East Neighborhood and to remain in scale with that adjacent area. The building mass has been pushed over towards the railroad tracks and 3rd Street to move upper floors away from the nearby residential properties . . . . The alley elevation would be predominantly be 2 to 3 stories. The 4th story, which contains only four of the project's 27 units, provides a substantial setback on the east (alley) side of 32 feet or greater . . . . The engaging street level design, building articulation and facade breaks, mix of building materials and architectural details, and stepped back upper stories on the east and north sides all work

5

together to create a compatible project for the surroundings. . . . Thus, staff believes that it would be substantially consistent with the applicable design guidelines and comply with the primary design features called for in the transitional area."

Finally, the report cited an illustrated case study in the DTRN of an appropriate project for the 3rd Street special character area. The illustration was of a three-story building with a "fourth story element," and a setback third story. The report found Trackside "absolutely consistent" and "virtually interchangeable" with the case study, albeit with fewer dwelling units per acre than the case study, and "[t]he Trackside proposal actually features greater architectural relief and setbacks than the case study image demonstrates."

### The City Approves Trackside

The City Council approved the Trackside project, finding the project conformed to the General Plan, and the CASP. At the city council meeting where the vote was taken, council members offered statements after hearing public comments on the project.

One councilmember cited the four-story DTRN case study, and went on to reject the idea that guidelines were waived or ignored, explaining: "I believe our staff has done a very good job in presenting a solid case as to why that's not the case, and that why . . . the Trackside Project image is absolutely consistent with the actual case study . . . ." He also cited DTRN guidelines that "increase building scale and height may be allowed in portions of mixed-use special character areas such as along B and 3rd Streets."

The councilmember went on to explain that Trackside, "would be an extension of a neighborhood that already includes three-story buildings, 40-foot buildings, three-story apartment complexes," as well as "a transition to a downtown that . . . does include 70-foot structures, and we think, maybe someday, will include six story buildings . . ." He also noted that "this is the transition not from the immediate neighbors, but from the neighborhood as a whole."

6

The mayor commented that "the clear overarching vision" of the CASP, "is about the economic vitality of the downtown," and the CASP guidelines take that vision and figure out how to do it without harming the neighborhoods. He concluded that Trackside "clearly contributes to the goal of the Core Area Specific Plan," and "the intent of the design guidelines." He went on to explain, "I'm not convinced that this project is going to hurt [Old East Davis]," The mayor described Old East Davis as "eclectic" and "extremely diverse," noting, it has a strip mall, "some quirky commercial spaces," apartment blocks, old historic houses with varying heights, and single family residences. He also explained that the city can lay out a vision for an area, but without owning the majority of the properties, the city relies on property owners to propose development and redevelopment. The city must therefore wait for projects that help it achieve its goal.

The Sustainable Communities Environmental Assessment/Initial Study

When the city council approved the project, it adopted a Sustainable Communities Environmental Assessment/Initial Study (SCEA) prepared for the project. A SCEA study is a streamlined environmental review permitted for projects qualifying as transit priority projects. (*Sacramentans for Fair Planning v. City of Sacramento* (2019) 37 Cal.App.5th 698, 706.)

The SCEA study noted the Trackside site "is at the nexus of many different land uses and zoning: railroad, rock yard, commercial and a traditional neighborhood." Trackside would use varied architectural styles, setbacks, and step-backs "to aid in the transition of the varying uses, scales and characters that surround the site." "Along the eastern edge of the proposed building, the architecture is designed to create a traditional residential look-and-feel. The building would be massed away from the east and north in a series of stepbacks. On Third Street, a 'Main Street' traditional storefront component would dominate the pedestrian experience with the top floor set back from view. Along the railroad, the plaza would be anchored by an existing cork oak tree. The architecture

7

of this facade would be more industrial in nature, reflecting the site's history and railroad adjacency."

The study concluded, the project will "certainly change and alter the existing visual character of the site," but not so as to " 'degrade' the visual character of the site . . . ." The study found "no substantive evidence that the Trackside Center site is significant to the character of the Old East Neighborhood, other than by inference that it abuts the alleyway adjacent to the neighborhood." And "[h]istoric photos, illustrations, and maps suggest that utilitarian design and larger mass and scale of former buildings in the corridor was markedly different than the Old East residential neighborhood to the west, and different than the downtown core area to the west. Therefore, new infill should be distinct from the Old East residential architecture and the downtown core commercial architecture."

It also concluded the project's urban components "would be consistent with the City of Davis General Plan" and would adhere to DTRN guidelines. While Trackside may exceed the recommend scale of two to three stories, "the proposed building height, varying elevations, stepping back of the upper floors, and setbacks, is consistent with several other commercial buildings in the core downtown area, and to some degree reflects the historic use patterns of the area along the railroad tracks." Further, a two- and three-story appearance is maintained along the eastern alley. And because "the current proposal is massed such that from 3rd Street, I Street, and the alleyway it will be perceived as predominately a three story building."

The Challenge to Trackside

After Trackside was approved, the Association challenged the approval, petitioning for a writ of mandate. It maintained Trackside failed to meet requirements for a SCEA assessment, and Trackside was inconsistent with applicable planning guidelines.

8

The trial court granted the petition, concluding the record did not support the City's decision, reasoning that it was "a fundamental policy of the General Plan" that Trackside be a "transition property" and that policy was not satisfied. In so concluding, the court relied on several portions of the General Plan, the CASP, and the DTRN.

The court cited General Plan Principle 4: "Accommodate new buildings with floor area ratios that can support transit use, especially within ¼ mile from commercial areas and transit stops, but maintain scale transition and retain enough older buildings to retain small-city character." It also cited General Plan Policy UD 2.3, which "[r]equire[s] an architectural 'fit' with Davis' existing scale for new development projects," and enumerates three "Standards": (1) "There should be a scale transition between intensified land uses and adjoining lower intensity land uses"; (2) "Taller buildings should be stepped back at upper levels in areas with a relatively smaller-scale character"; and (3) "Buildings should be varied in size, density and design."

The court also cited the general plan's description of the CASP as, "support[ing] maintaining a small-town downtown and encourag[ing] pedestrian, social and cultural activities and shopping in the core area. The plan promotes building up the 'downtown core' . . . before greatly increasing densities in the remainder of the core area, thereby protecting existing residential neighborhoods and their character." The General Plan also described the CASP as encouraging, "appropriate scale transitions between buildings."

The court quoted a portion of the CASP explaining, "[t]he single most important issue of infill development is one of compatibility, especially when considering larger developments. When new projects are developed adjacent to older single family residences, concerns exist that the height and bulk of these infill projects do not have a negative impact on smaller scale buildings." It also cited CASP "Land use policy 7B" that "[t]he area along Third Street shall be treated with sensitivity because of potential impacts on adjacent land uses. Development along this corridor shall be of an appropriate scale and character in relation to the surrounding and adjacent land uses."

9

As to the DTRN, the court cited the introduction, which explained: "the community engaged in [an] extensive public process to discuss how the traditional center of Davis can accommodate housing and economic development objectives in a way that is sensitive to the area's traditional scale and character. This document provides a policy and urban design framework that is shaped by design guidelines and a supporting design review process." It also cited the DTRN's "Mixed-Use Design Guidelines" to "[m]aintain the scale of a new structure within the context of existing buildings on the block," and the four subordinate guidelines: (1) "Design a front elevation to be similar in scale to those seen traditionally on the block"; (2) "Minimize the perceived scale of a building, by stepping down its height toward the street and neighboring smaller structures"; (3) "The primary building face should not exceed the width of a typical single family building in a similar context"; and (4) "Break up the perceived mass of a building by dividing the building front into 'modules' or into separate structures that are similar in size to buildings seen traditionally in the neighborhood."

Finally, the court cited the four DTRN design objectives for the proposed Trackside location: (1) "this area should improve the visual and land use transition from the Commercial Core to the Old East residential neighborhood"; (2) "new mixed-use buildings should be built to the sidewalk edge with landscape courtyards incorporated to vary the building setbacks along the street"; (3) "building architecture should respect the traditional residential character of the neighborhood"; and (4) "parking should be incorporated off the alleys in private parking courts."

From these, the court concluded consistency with the applicable planning documents requires Trackside to be a "transition property." The court thus framed the questions as: "What is in the Core Commercial Area and what is in the Old East Davis neighborhood and is Trackside a transition between the two." To this question, the court explained, mass and scale are as important as the property's proper use.

10

The court went on to find that based on the totality of the circumstances, Trackside was inconsistent with planning provisions governing transition. It cited the step-back design, the 30-foot alley, the existence of four-story buildings in downtown and 40 foot homes nearby, and the case study illustration, before asking: "Is that a sufficient factual basis to support a rational conclusion that Trackside is a transition project between the Commercial Core Area and the Old East Davis Neighborhood?"

The court explained that two comparable four-story buildings in the Downtown Core, the Chen and McCormick buildings, are smaller than Trackside, with the Chen Building being half Trackside's size. It noted the hardware store, west of the train tracks, is single story, and nothing on the 3rd street corridor is remotely near the size of Trackside. And other than two parking garages, Trackside would be the largest building on the east side of downtown by a large margin.

The court also cited guidelines that new buildings be predominantly two and three stories, and a guideline for the Core area, "that new buildings shall not exceed 45 feet in height." The trial court did not provide a citation for this guideline but may have been referring to a DTRN Downtown Core guideline that says that, "The primary portion of any new building should not exceed 45 feet in height." The guideline also provides that "Setbacks to third and fourth stories should be considered" and, "Taller projections for towers and fourth story elements may be incorporated if they are appropriately scaled to complement the new building and surrounding neighborhood."

The court called the suggestion that the Downtown Core might someday include five- and six-story buildings speculation: "The most reasonable conclusion is that inside the Downtown Commercial Core Area, under the current general plan, there would be similar development like the Chen and McCormick buildings." It similarly called reliance on the case study overstated, as the guidelines talk of densification on the west end of 3rd Street, not the east end. And while the Trackside site is an "opportunity site," authorizing 40 units per acre, that designation does not outweigh the fundamental

11

consideration that the project be a transition, including as to mass and scale. It noted that Trackside would be four times larger than the current buildings at the site and under the CASP, Downtown Core sites should be densified before densifying other areas.

In addition, the court found: "The features relied upon by the City to justify the Project, like the step-backed design, do not really address the larger issue of the mass and scale of the project. Nothing in the Staff Report or record rationally explained how a 47,900 square foot building constituted a transition project." It added that while the guidelines clearly support a mixed-use project at the location, "the failure here is that the mass and scale of the proposed project is not reasonable under the current law and factual circumstances. There simply is not a logical and reasoned case to be made that Trackside is a 'transition' from the Core Area to the Old East Davis neighborhood." But, "a smaller scale mixed-use project or a project where the mass and scale is broken up would effectively harmonize the policy of transition and infill, without requiring an amendment to the General Plan."

Finally, the trial court also concluded that because the project was inconsistent with the General Plan, the SCEA was therefore inadequate. It did, however, find that Trackside was a Transit Priority Project, qualifying for SCEA review.

The trial court granted the petition, directing the city to vacate and rescind its approval.

## DISCUSSION

### I

### *Consistency with Applicable Planning Policies and Guidelines*

On appeal, the City and Trackside challenge the trial court's ruling. In separate briefs, they argue the trial court exceeded its authority in failing to defer to the City's findings and in applying its own views. They maintain that Trackside is consistent with applicable planning policies and guidelines.

12

The Association responds that the trial court correctly found the project inconsistent with the general plan, arguing the court simply reviewed the record for substantial evidence and found "[n]othing in the Staff Report or record rationally explained how a 47,900 square foot building constituted a transition project." It goes on to argue Trackside's upper-story setbacks do not constitute an appropriate transition between Old East Davis and the Downtown Core, and the applicable guidelines do not allow for scale transition within a building, but must be between buildings.

We conclude that the City's determination of consistency to the general plan was not unreasonable and that substantial evidence supports the City's approval of the Trackside project.

A. *Standard of Review & Applicable Law*

The party challenging a city's determination of general plan consistency has the burden to show why the determination was unreasonable based on all the evidence in the record. (*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1563.)

A city council's determination that a project is consistent with the General Plan carries "a strong presumption of regularity." (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 717.) Its determination can be overturned only if it abused its discretion—that is, it did not proceed legally, its determination is not supported by the findings, or if the findings are not supported by substantial evidence. (*Ibid.*) As to substantial evidence, a determination of general plan consistency will be reversed only if "a reasonable person could not have reached the same conclusion" based on the evidence before the local governing body. (*Families Unafraid to Uphold Rural El Dorado County v. El Dorado County Bd. of Sup'rs* (1998) 62 Cal.App.4th 1332, 1338 (*FUTURE*).)

Further, courts recognize that " 'the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when

13

applying them in its adjudicatory capacity.' " (*San Franciscans Upholding the Downtown Plan v. City & County of San Francisco* (2002) 102 Cal.App.4th 656, 677–678.)  And " '[b]ecause policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes.' " (*Id.* at p. 678.)  To that end, " '[a] reviewing court's role "is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies."  [Citation.]' " (*Ibid.*)

We also note that while the parties here have concentrated their arguments on the trial court's reasoning, under the applicable standard of review, " 'the trial court's determination is not binding on us.' " (*West Chandler Boulevard Neighborhood Assn. v. City of Los Angeles* (2011) 198 Cal.App.4th 1506, 1518.)  Instead, we apply the same standard as the trial court, exercising independent judgment.  (*Ibid.*)

B.     Analysis

The main point of contention, both in the trial court and on appeal, is whether substantial evidence supports the City's finding that Trackside serves as a "transition."  According to the General Plan, new buildings must "maintain scale transition," as well as provide an "architectural 'fit' " with "existing scale for new development project."  There must also be "a scale transition between intensified land uses and adjoining lower intensity land uses."

According to the CASP, "compatibility, especially when considering larger developments" is of paramount importance.  The CASP cites "concerns" that the "height and bulk" of new projects "do not have a negative impact on smaller scale buildings."  It also instructs that development on 3rd Street "shall be of an appropriate scale and character in relation to the surrounding and adjacent land uses."

14

And according to the DTRN, development should be "sensitive to the area's traditional scale and character." It refers to "maintain[ing] the scale of a new structure within the context of existing buildings on the block" and having a front elevation that is "similar in scale" to those "traditionally on the block." It also refers to minimizing the perceived scale of a building, through step-backs, and by having the primary building face not exceed the width of a typical single family building in a similar context. It also provides that, "[a] building shall appear to be in scale with traditional single-family houses along the street front."

While certain criteria, such as "scale," are clearly important, the planning documents do not provide a formulistic method for determining whether a proposed structure constitutes a transition. Instead, a determination must rest on subjective measures such as "architectural 'fit,' " "appropriate scale and character," "sensitiv[ity] to the area's traditional scale and character," and "appear[ance] in scale."

In this respect, this case is distinguishable from our decision in *FUTURE*, *supra*, 62 Cal.App.4th at page 1341, a case the Association cites in support. There, the county general plan restricted low density residential designations to "lands contiguous to Community Regions and Rural Centers . . . ." (*Id*. at p. 1340.) The proposed low density project at issue was not contiguous to a community region or rural center, yet the county approved it. (*Id*. at pp. 1340-1341.) In concluding the project was inconsistent with the general plan, our court rejected the county's argument that inconsistency with one general plan policy should not be enough to scuttle a project. (*Id*. at p. 1341.) We explained that while a project need not be in perfect conformity with each and every policy, "the nature of the policy and the nature of the inconsistency are critical factors to consider." (*Ibid*.) We found the policy at issue "fundamental . . . mandatory and anything but amorphous," while the inconsistency was "clear" and "not an issue of conflicting evidence." (*Id*. at pp. 1341-1342.)

15

Here, by contrast, the policy at issue, transition, is largely amorphous, and the dispute is a question of conflicting evidence:  do the step-backs, mass shifting, extra wide alley, and other factors create an "appropriate scale" that is "sensitive to the area's traditional scale and character"?

The trial court, nevertheless, applied a formulistic approach, reasoning that a mixed-use building outside the downtown core could not exceed the height and size of a mixed-use building inside the downtown core and still be considered a transition.  In so doing, the court discounted the step-back design, the 30-foot alley, 40-foot homes in Old East Davis, a 70-foot parking structure in the Core Area, the case study, and other factors relied on by the City.  But while the City could have appropriately found those factors insufficient given the project's size and height, it is not the court's role to reweigh the factors unless no reasonable person could reach the same conclusion based on the evidence.  And we see nothing in the planning documents that compels the conclusion that the City's reliance on the cited factors was inherently unreasonable.  Indeed, if the planning documents were intended to prevent the construction of a mixed use building outside the downtown core that is taller than mixed-use buildings inside the core, the documents could have said so.  And where the planning documents do provide quantitative standards (e.g. "Accommodate new buildings with floor area up to three times site area"), there is no indication Trackside runs afoul of them.

The trial court cited a guideline for the Core Area "that new buildings shall not exceed 45 feet in height," while noting Trackside is 50 feet.  But no citation was provided, and the court appears to be citing the DTRN guideline that "[t]he *primary portion* of any new building should not exceed 45 feet in height," which goes on to provide that "Setbacks to third and fourth stories should be considered," and, "Taller projections for towers and fourth story elements may be incorporated if they are appropriately scaled to complement the new building and surrounding neighborhood." (Italics added.)  Thus, not only does the guideline not appear mandatory, it pertains only

16

to the "primary portion," of the structure and the record reflects that Trackside's fourth floor contains only four of the 27 units.

For its part, the Association, points to nothing in the applicable planning documents that Trackside unambiguously ran afoul of. The Association argues Trackside cannot be a transition between the Core Area and Old East Davis if it is the largest building in the area. But nothing in the planning documents expressly compels that conclusion. For example, language in the CASP that "[b]uildings in the Core Area are generally one and two story structures" is not the same as a prohibition on four story structures.

The Association also argues Trackside would overwhelm the existing residential neighborhood and that nothing in the record rationally explains how a 47,900 square foot building constituted a transition project. But the question of overwhelming a residential neighborhood is in the eye of the beholder — indeed, the mayor described Old East Davis as "eclectic," with a strip mall, apartment blocks, and houses of varying heights.

We note the SCEA reported: "In the 1960s and 1970s a number of mixed-use or multi-use buildings were constructed in Old East Davis. Many of these post- World War II buildings are large, monolithic structures, which abut the property line and are focused inward toward a central swimming pool or courtyard. These more recent buildings break strongly with the generally small scale of the older built environment, and the traditional pattern of setbacks and street landscape. Their insertion into the neighborhood visually breaks up and segregates enclaves of traditional housing stock, disrupting the linkage and continuity between the older buildings."

In any event, whether a new structure might or might not overwhelm this particular neighborhood requires the balancing of many factors, and cannot be determined by reference to square footage alone. Again, if square-footage was dispositive, we expect the planning documents would have said so.

17

Finally, the Association argues the DTRN guidelines allowing for greater density on B and 3rd street do not apply to the Trackside location. It points to the DTRN language cited in the staff report that: "Increased building scale and height may be allowed in portions of mixed use special character areas such as along B and 3rd Streets." It argues these guidelines apply only to the B and 3rd Street Visioning area, an area closer to the UC Davis campus (Trackside is to the east, between G and I street).

A review of the record suggests the "[i]ncreased building scale and height" language was indeed added following the City's "B and 3rd Streets Visioning Process," which ultimately recommended establishing a "creative district" for B and 3rd Streets "with a larger scale and higher density development pattern." Still, the cited language is not limited to B and 3rd Street: "*such as* along B and 3rd Street." And Trackside is located in an opportunity site where additional density ("at an average density of 40 units per acre") is encouraged, as well as two special character areas. Trackside is also in a transition area bordering downtown, about which the DTRN explains: "Mixed-use Transition areas bordering the Downtown Commercial Area are intended to provide space for intensified mixed-use projects. . . ." We therefore see no abuse of discretion in the City's reliance on the "Increased building scale and height" language. (See *San Franciscans Upholding the Downtown Plan v. City & County of San Francisco, supra,* 102 Cal.App.4th at pp. 677–678 [" 'the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity' "].)

In sum, we conclude substantial evidence supports the City's approval in that we fail to find that "a reasonable person could not have reached the same conclusion" based on the evidence before the City. The City therefore acted within its discretion and the trial court erred in reversing its approval of Trackside.

## II

### *The Cross-Appeal*

A.     CEQA, the railroad lease and hazardous materials

By way of cross-appeal, the Association contends the trial court failed to rule on three issues it raised regarding the City's failure to comply with CEQA.  First, the Association argues the project is inconsistent with General Plan policies on historic preservation and will impact the Old East Davis conservation district.  Citing an architectural historian's report, the Association maintains the City failed to adequately account for the impact to the Old East Davis conservation district in the SCEA (and reports cited therein) and instead reviewed only the impact on historic buildings.

Second, the Association argues the SCEA failed to adequately address the possibility that Trackside could lose its lease to railroad land, which would affect floor-to-area ratio, increased lot coverage, and increased density above the maximum allowed for mixed use, parking, and open spaces.

As to this point, the SCEA explains:  "The railroad leased area is currently and has historically been leased, controlled or utilized by the owners of the project site.  The leased area is currently used for vehicle and bicycle parking, a trash enclosure and landscaping, and for pedestrian egress/ingress from 3rd Street."  The area "has been leased from Union Pacific Railroad for over 100 years . . . ."  "The [Trackside] project makes use of [the leased area] along the west side of the project site where the outdoor plaza and several parking spaces would be located."  Trackside's "[p]roposed floor area ratio is 1.59 for the gross project area (2.1 [floor area ratio] without lease area)."

Third, the Association argues the SCEA failed to address the potential of finding hazardous materials spilled from the adjacent railroad, and the possibility that soil excavation may mobilize noxious and corrosive chemicals that settle on neighborhood

19

structures. It cites in support a geologist consultant who concluded the SCEA failed to properly address human exposure to hazardous substances.

As to each of these, the City responds the claim is forfeited because the Association failed to object to the trial court's tentative decision — which expressly declined to reach those issues — and instead urged the court to adopt the tentative decision. We agree with the City.

The failure to request a ruling on these contentions, after the trial court issued its tentative decision expressly declining to rule on them, forfeits the contentions on appeal. (See *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1138 ["it would be unfair to allow counsel to lull the trial court and opposing counsel into believing the statement of decision was acceptable, and thereafter to take advantage of an error on appeal although it could have been corrected at trial"]; *Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 912 ["when a trial court announces a tentative decision, a party who failed to bring any deficiencies or omissions therein to the trial court's attention forfeits the right to raise such defects or omissions on appeal"].)

We further note that, had these challenges been preserved, they would have no merit. As to historic preservation, the SCEA, and responses to comments and errata, addressed the impacts to the neighborhood by noting the Old East Davis neighborhood, a conservation district, is not a designated historic district, and therefore CEQA requirements regarding historical impacts to the neighborhood at large were not implicated. The Association has offered neither authority nor explanation as to why that conclusion was erroneous.

As to the lease, the SCEA noted the parcel has been leased from the railroad for over 100 years. The responses to comments and errata also noted, "Project approvals and the new [Planned Development] zoning for the site have taken into account the possible loss of the leased land and ensure that the Project will remain consistent with

20

development standards including, but not limited to, density, lot coverage, floor area ratio, open space, parking." Further, the CASP was amended to accommodate Trackside's density, even without the lease. And a City ordinance placed a special condition on Trackside's approval: "In the event that the lease area is no longer available for use by the project, property owner shall notify the City and obtain any necessary City approvals to address the changes to the parking and other improvements, such as stormwater quality measures, located in the lease area."

And as to environmental hazards, the SCEA and incorporated reports, reported the finding of "wood fragments (rail tie remnant)" and a "slight petroleum hydrocarbon odor" in the area adjacent to the train tracks. But there were no soil or geologic conditions that would preclude development as planned. A response to comments elaborated, "where the geotechnical consultant observed a petroleum odor in the sample, there is no evidence of soil contamination at the project site. If petroleum-impacted soils are encountered on-site during construction, adverse hazardous materials effects would not result because industry-standard, soil management measures would be implemented." The SCEA further explained: "Short-term dust impacts are addressed by standard city requirements for construction-related dust and erosion control measures. The project requires little or no site preparation beyond demolition and minor grading on the 0.69-acre project site. Additionally, construction-related activities are temporary and would be required to comply with standard city conditions for dust control during construction which are consistent with [Yolo-Solano County Air Quality Management District] recommendations. Therefore, the impacts are considered to be less than significant."

Thus, even if the Association's contentions were preserved, they would lack merit either because the SCEA addresses the issues raised or the challenge amounts to a disagreement among experts. (See Cal. Code Regs., tit. 14, § 15151 ["Disagreement among experts does not make an EIR inadequate . . . ."].) The contention therefore fails.

21

B.      Davis Municipal Code and DTRN Guidelines

The Association contends Trackside violated the DTRN guideline language that "[a] building shall appear to be in scale with traditional single-family houses along the street front." It maintains this language is mandatory based on the word "shall" and the municipal code's direction that "[w]herever the guidelines for the DTRN conflict with the existing zoning standards including planned development, the more restrictive standard shall prevail."

The trial court concluded the DTRN guidelines were relevant but not mandatory, and therefore the Association's cause of action, alleging a violation of the DTRN as incorporated by the Davis Municipal code, failed.

We agree with the trial court. While "shall" appears in the language, the language is found in a DTRN section titled, "Mixed-Use Design Guidelines." And as the DTRN explains, "[g]uidelines are generally descriptive statements that explain or illustrate a principal or preferred course of action." "[S]tandards," by contrast, "prescribe minimum acceptable limits," and "[l]anguage utilized for standards is unequivocal and often quantifiable."

The language "shall appear to be in scale with traditional single-family houses along the street front" is decidedly subjective and not the sort of unequivocal and quantifiable language that might be seen to set minimum acceptable limits. And while the Association relies on the municipal code direction that where DTRN guidelines conflict with existing standards, the more restrictive guidelines prevail, the Association fails to point to an existing standard that conflicts with the cited language.

And even if the language were considered mandatory, it does not follow that no reasonable person could agree with the City's conclusion that Trackside appears in scale with the adjacent area. As the staff report noted, the Trackside design is predominantly two and three stories on the alley side, with the third level set back, and the mass pushed

22

toward the train tracks. The City considered the scale and concluded trackside "would be substantially consistent with the applicable design guidelines . . . ." On the record before us, we cannot conclude that determination was an abuse of discretion. (See *Save our Peninsula Committee v. Monterey County Board of Supervisors* (2001) 87 Cal.App.4th 99, 142 ["we accord great deference to the agency's determination"]; *Pfeiffer v. City of Sunnyvale City Council, supra,* 200 Cal.App.4th at p. 1563 [a city " 'has broad discretion to construe its policies in light of the plan's purposes' "].)

The contention also fails.

### C.    SCEA Requirements

Finally, the Association contends Trackside fails to meet the requirements for a SCEA assessment, arguing, that Trackside failed to satisfy Public Resources Code section 21155.1's requirement that the project not have a significant effect on historical resources pursuant to section 21084.1. (Statutory section references that follow are to the Public Resources Code.)

Section 21155.1's requirements, however, pertain to the exemption of a project from the environmental review process altogether — not merely allowing the project to use the streamlined SCEA process. Thus, whether Trackside satisfies the requirement of section 21155.1 is of no moment.

Finally, in its cross-appeal reply brief, the Association argues that it seeks a determination as to whether substantial evidence supports the use of a SCEA under section 21155.2, which does pertain to the streamlined process employed. But the Association does not tell us how Trackside failed to satisfy section 21155.2 or how the trial court's finding that 21155.2 was satisfied was erroneous or why there is good reason the argument was not presented before. We therefore do not address the argument. (See *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 ["Issues do not have a life of their own: if they are not raised or supported by argument or citation to authority, we consider

23

the issues waived"]; *People v. Baniqued* (2000) 85 Cal.App.4th 13, 29 ["a point raised for the first time [in a reply brief] is deemed waived and will not be considered, unless good reason is shown for failure to present it before"].)

DISPOSITION

The judgment is reversed. The trial court is directed to enter a new judgment denying the petition for writ of mandate. The Association shall pay defendants' costs on appeal. (Cal. Rules of Court, rule 8.278.)


_____

HULL, Acting P. J.


We concur:


_____

MAURO, J.


_____

HOCH, J.

Filed 1/12/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| OLD EAST DAVIS NEIGHBORHOOD ASSOCIATION,<br><br>        Plaintiff and Appellant,<br><br>   v.<br><br>CITY OF DAVIS et al.,<br><br>        Defendants and Appellants;<br><br>TRACKSIDE CENTER, LLC,<br><br>        Real Party in Interest and Appellant. | C090117<br><br>(Super. Ct. No. CVPT172111)<br><br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

APPEAL from a judgment of the Superior Court of Yolo County, Samuel T. McAdam, Judge. Reversed.

Law Offices of Donald B. Mooney and Donald B. Mooney for Plaintiff and Appellant Old East Davis Neighborhood Association.

1

G. Inder Khalsa, City Attorney, City of Davis; Richards, Watson & Gershon and T. Peter Pierce, for Defendants and Appellants City of Davis, City Council of the City of Davis.

Sloan Sakai Yeung & Wong and Kirk E. Trost for Sacramento Area Council of Governments; Hanson Bridgett, Adam W. Hofmann and Robia S. Crisp for League of California Cities and California State Association of Counties as Amicus Curiae on behalf of Defendant and Appellant City of Davis.

Taylor & Wiley, John M. Taylor, Kate Anne Wheatley and Matthew S. Keasling for Real Party in Interest and Appellant Trackside Center, LLC.

THE COURT:

The opinion in the above-entitled matter filed December 20, 2021, was not certified for publication in the Official Reports and it is so ordered.

BY THE COURT:

_____
HULL, Acting P.J.

_____
MAURO, J.

_____
HOCH, J.

2